**SERVO CORPORATION OF AMERICA,**
Plaintiff,

v.

**GENERAL ELECTRIC COMPANY,**
Defendant.

Civ. A. No. 566(H).

United States District Court
W. D. Virginia,
Roanoke Division.

June 22, 1963.

Thomas F. Reddy, Jr., Roy C. Hopgood, New York City, B. Purnell Eggleston, Roanoke, Va., for plaintiff.

Charles H. Walker, New York City, Leonard G. Muse, Roanoke, Va., L. B. Birdzell, Jr., George V. Eltgroth, Melvin M. Goldenberg, David W. Plant, New York City, for defendant.

DALTON, Chief Judge.

A tiny flake of a metallic substance the size of a mouse's toenail, when activated by infrared waves, sets into motion a chain of events which form a background for this important litigation.

An age-old problem confronting railroads everywhere has been the ever recurring "hot journal box" which house the brass bearing that fits over the top of the railway car axle. The method used to lubricate the axle is to use waste, saturated with oil, placed in the journal box of each wheel. By "packing the box" and by frequent inspection, the carriers were able to keep relatively few the number of overheated journal boxes which were of disabling effect on the movement of trains. Notwithstanding all the efforts of the railways in this direction, many "hot boxes" occurred on trains en route, and this frequently resulted in the breakdowns and delays which were quite expensive to the carriers. Consequently, on all sides and for generations, there has been a continuing search by the railways and others interested in finding a way by which the overheated journal boxes could be detected before appreciable harm was done, and thereby facilitate and expedite the movement of railway traffic in this fast-moving age.

A method which, for all practical purposes, solves the problem has been developed, and it is on the question of whether the plaintiff, Servo, is entitled to credit for the result that this controversy arises.

This important action, the trial of which required some 33 days, plus some 4 days of helpful argument by able counsel, with 6541 pages of evidence and 733 exhibits, has been a strongly contested one, and happily, by agreement of the parties, the Court had the benefit of an outstanding member of the bar of the Western District of Virginia, the Hon. R. S. Kime, to assist the Court as Special Master in the determination of the intricate, technical and difficult issues involved, who spent months in study and preparation of his report.

The service of the Special Master has been helpful in the study, sifting and correlation of the volumes of testimony and exhibits, thus lifting a load of detail work from the District Judge. However, the Court is conscious of its duty and judicial responsibility to decide the issues presented, and it was partly with that thought in mind that the Court sat with the Master throughout the proceedings in this case. To avoid influence on the thinking of the other, neither the Special Master nor the Court indicated to the

other his thinking on the issues as the evidence was developed.

### The Issues

This action involves the question of the validity and infringement of three patents owned by Servo Corporation of America, namely:

(1) Patent No. 2,937,857, referred to as the 857 "Shutter" Patent;

(2) Patent No. 2,880,309, referred to as the 309 "Orientation" Patent; and

(3) Patent No. 2,963,575, referred to as the 575 "Alarm" Patent.

### (1) The 857 "Shutter" Patent

Special Master Kime, in his report, held the "Shutter" patent invalid for the reason that the results achieved were obvious to and could be accomplished by one skilled in the art and that there was a lack of novelty or newness in this alleged invention.

No objections were made by plaintiff, Servo, to this holding of the Master, and the Court agrees fully with and confirms the findings of the Special Master as to the invalidity of said 857 "Shutter" patent.

### (2) The 309 "Orientation" Patent

This is the basic patent involved.

The Special Master, in his report, upheld the validity of the 309 "Orientation" patent as to claims in suit numbered 5, 6, 9, 10 and 11, and further found that defendant, General Electric Company, had infringed upon the rights of Servo in connection with said patent, and had copied it in the features essential for successful operation of a hot box detector.

General Electric defended as to the 309 "Orientation" patent on the grounds that the subject matter of the patent would have been obvious to a person having ordinary skill in the art; that it is invalid because of prior public use, sale and publication of its subject matter for more than one year prior to the disclosure of the subject matter to the patent office; that the patent does not disclose the best mode contemplated and known by the patentees for practicing the alleged invention, and that said patent was neither infringed nor copied.

In this findings as to the 309 "Orientation" patent, the Special Master says in his report:

" * * * The claim of the inventors is that they were the first to construct an apparatus consisting of certain component parts housed in a sturdy metal box (physical models of both the Servo and G. E. detectors were filed as exhibits) to be mounted trackside, preferably on a metal, concrete or wooden base, in such a manner as not to be affected by the passage of trains, looking upward and inward at such angles (in relation to the rails) so that the apparatus will view only the trailing (lateral) sides of passing journal boxes. Servo claims that it was the first to so construct and mount trackside, below the level of wheel axles, such a device so that its internal components would scan only journal boxes and register their temperature to the exclusion of all other heat sources that would otherwise tend to actuate false signals and that this was accomplished by using or taking advantage of the underside of the cars as a uniform reference background. This manner of mounting and pointing the apparatus is referred to as the 'toed-in' method which the inventors say is the crux of their invention.

"The body of the detector is composed of a heavy outer metal shell with a partial interior shell which, with its air space, tends to keep down the interior temperature of the box. Housed within the box is a lens, bolometer and an amplifier all electrically connected so that the device when mounted trackside and in operation can receive infrared heat waves from passing journal boxes. The metal shutter, which is the subject of the '857 patent, or 'Shutter' patent, and which the inventors claim acts not only as a protection to the delicate internal

parts of the detector but as a reference background when the detector is not scanning, opens when the first wheel of the train passes over a magnetic transducer or wheel trip, whereupon, the device is made ready to receive heat signals from journal boxes as long as the train is in motion and as each successive wheel passes over the wheel trip the shutter stays open until a brief interval after the train's departure, whereupon, it automatically closes.

"Hundreds of pages of evidence are devoted to a detailed description of bolometers, lens, shutters, amplifiers and circuitry and the part each and all play in connection with hot box detectors. An almost equal number of pages deal with various types of wheel trips, mechanical, magnetic and electrical, the function of which is to open the protective shutter of the detector and while the train is in motion gate through to the recorder the heat signals from passing journal boxes. This gating is generally denominated as *time* gating, where the signal is of a fixed duration, or *space* gating, where the signal is gated through for a time space which is governed by the speed of the train. Space gating is generally accomplished by the use of two wheel trips or transducers.

"Both Servo and G. E. use in their equipment the 'thermistor bolometer' patented in the 1940's by Bell Telephone Laboratories but marketed by Western Electric, both being affiliates of the American Telephone and Telegraph Company—licenses to use such equipment having been granted to Servo and G. E.

"Plaintiff and defendant agree that the thermistor bolometer has aided greatly in the receptive diagnosis of infrared signals from heated metals, especially in the hot journal box field area. Servo is licensed to manufacture thermistor bolometers, which are extremely sensitive to in-frared heat waves. These waves are passed on to the bolometer through a lens which is located in a tube or barrel in front of the bolometer. The function of the lens is to act as a filter so as to pass on to the bolometer only waves of a certain length; the infrared energy waves being in a range from about 2 to 12 microns.

"The lens problem was early found to be a most difficult one. Ordinary glass will not permit the passage of infrared energy waves. Various substances were experimented with and Servo came up with an arsenic trisulphide lens which it called 'Servofrax lens.' This proved to be the most satisfactory type of lens for hot box detection purposes. When the shutter opens, the arsenic trisulphide lens permits the infrared energy waves to pass through to the thermistor bolometer, composed of two elements arranged in a bridge circuit. The active flake only of the bolometer receives the energy from the infrared waves causing it to change its resistance, with respect to the inactive element of the bolometer which, in turn, brings about a differential electrical output from the bridge. The amplifier then amplifies this voltage to a point where sufficient power is generated to make a recording on a tape or sound an alarm.

"Amplifiers are either of the D-C (direct current) or A-C (alternating current) type.

"It was soon learned that a D-C amplifier would not successfully function in a hot box detector other than possibly a laboratory model. G. E.'s expert, William D. Cockrell, admits this and Warshaw found this out in his 1949 experiments. The A-C amplifier is used by both Servo and G. E.

"The A-C amplifier has desirable operating characteristics in that its gain can be made uniform and it is substantially independent of power

supply voltage variations, the smallest changes in which creates a drift problem in a D-C amplifier. When, however, an A-C amplifier is used in an instrument to scan hot journal boxes, it has the disadvantage of becoming saturated and thus fails to pass informative signals for a short period of time after the detector has viewed an extremely hot or cold source, just prior to viewing the journal box (in this case the target). The experts for both Servo and G. E. agree on this.

"Benjamin Cooper, another of G. E.'s exports, testified that an A-C amplifier acted as though it had a memory recording the history of what happened previous to it, whereas, a D-C amplifier does not have a memory. The importance of this is of great significance in the practical application of the use of a thermistor bolometer in a hot box detector. If the bolometer is exposed to any source (other than a passing journal box), such as the sky, snow, reflections from a bright object, or an unfavorable background, from which infrared heat waves emanate, the bolometer will pass the signal through to the amplifier which may thus become saturated and a false signal or recording will result.*

" * As will hereafter appear, G. E.'s electronic expert Cockrell insists the role that the amplifier plays is more important than the manner in which the detector is oriented."

Servo claims that its orientation invention solves this most difficult problem by mounting its detector track-side below the level of passing journal boxes, angled upward and inward so that the bolometer, when not receiving heat waves from journal boxes, is focused on the underside of the passing cars, which provide a quiescent background, the ambient temperature remaining the same during the day or night, and throughout all seasons of the year, regardless of the direction of the movement of the train, and that the temperature of which, in relation to the journal boxes, can be accurately determined to the exclusion of other discordant heat sources so as to detect only overheated journal boxes. This Servo claims can be done, even without gating through the signal when otherwise only the journal box is in view. G. E. claims that orienting the detector is perfectly obvious, even to one unskilled in the art, and that this method, at least as to the mounting of the detector track side and angled upward, is disclosed by the prior art. G. E.'s experts and its counsel contend that the secret of successfully viewing overheated journal boxes resides in a combination of a proper filtering lens, a thermistor bolometer and a non saturating amplifier. The record contains no evidence that a non saturating amplifier is as yet available. G. E.'s Cockrell, * * * who admittedly is the father of G. E.'s hot box device, one of its top electronic engineers, and the publisher of a text book on 'Industrial Electronic Control' (later edited as an 'Industrial Electronic Handbook') when cross examined on the use of amplifiers, testified as follows: (R–4315–16)

" 'Q. So this was not important; the viewing angles were not important?

" 'A. So far as I am concerned, the viewing angle was not important then; it is not *extremely* (emphasis supplied) important now; except as a crutch for an infrared amplifier. If we had a perfect D-C amplifier, we would not worry at all about angles.

" 'Q. Oh, well, do you have perfect D-C amplifier today?

" 'A. We do not.

" 'Q. Oh, I see. So the use of this equipment so far as orientation and angles is concerned is to some extent limited by the fact that you

had an A-C amplifier to work with, only?

"'A. I am afraid that's a fact of life.'

"Again, (R–4450) when questioned by G. E.'s trial counsel, Cockrell said:

"'* * * and I think the court will appreciate if we had an amplifier which would not saturate, which would not change its calibration over the days and we could then so gate that amplifier that only the signal that came from the bolometer as we were looking at the journal—we would have an excellent output *with very little to bother from the outside influence* (emphasis supplied). Since we cannot have a perfect amplifier, we make the best we can and then use these various crutches for protection of the bolometer against strong outside light and that type of thing to assist it.'

"Cockrell characterizes the 'toe-in' viewing angle as one of the crutches. While constantly stressing the importance of the role the amplifier plays in the successful scanning of journal boxes, yet he is nevertheless forced to admit its present limitations which necessitates the use of his so-called 'crutches.'

"The thermistor bolometer is patented and used by both Servo and G. E. Servo asserts no inventive claims as to its arsenic trisulphide lens, likewise used by both. The A-C amplifier is an integral part of the equipment of each. None of these elements of the detectors of plaintiff and defendant, together with their electrical circuitry, are directly involved in Servo's invention claims relating to its 'orientation' '309 patent, other than they constitute essential components of the detector of each.

"The amplified output of the bolometer, which reflects changes in the infrared radiation which falls upon it, is employed by both parties to actuate pens of a recording galvanometer. These recordings are made on a tape. Detectors are mounted, one on either side of the tracks so that the temperature of each end of the axle can be read; thus, there are two lines produced on the paper tape of the recorder. Each line contains a series of pips, the height of the pips above the base line indicating the temperature of passing journal boxes. There are several kinds of recorders. Sanborn recorders are standard equipment for both Servo and G. E. These recorders can be placed near the vicinity of the detectors or may be placed some distance away. In actual operation it is desirable to mount the detector trackside several miles beyond a railroad repair yard and transmit the signal to the recorder located within the yard. The tape is thus read at a point considerably in advance of the incoming train. An experienced operator can thus determine, from studying the tape, if there are overheated journal boxes on any of the cars. There is no contention on the part of either as to its right to make use of recorders.

"Those who sought to solve the hot box journal problem were faced with many perplexing difficulties. Aside from the selection, assembly and housing of the internal components of an apparatus designed to view journal boxes of passing trains, it was also necessary to take into consideration many factors such as: the type of journal bearings, whether friction or roller, the shape of the journal box,* the varying di-

"* Journal boxes housing roller bearings are generally smaller, more rounded, and do not protrude as far, measured from the end of the axle, as do friction journal boxes and hence proved more difficult to bring within the view of the scanner."

ameter of the wheels, the sway or motion of the train, as well as its speed, the portions of the journal box to be scanned, whether the lid, top, bottom, leading or trailing sides,

the heat sources on the train, such as brake shoes, steam hoses, etc., and especially outside disturbing factors, the sun, clouds, snow, reflections and any unfavorable background. Added to all of this is the fact that railroads, of necessity, must make use of rugged and exacting equipment, designed to be utilized in an environment where utility and dependability are essential. While G. E. insists otherwise, there was no real break-through or solution of the problem until Servo's Gallagher and Pelino collaborated."

The Special Master details the conception of the 309 "Orientation" idea by Gallagher and Pelino of Servo in April, 1956, when they began "looking in such a manner as to get at the bottom of the car for this referencing and still sweep the journal and miss the remainder of the hot sources."

And the Special Master concluded:

"The evidence clearly demonstrates that, despite G. E.'s insistence to the contrary, no one prior to the combined undertakings of Gallagher and Pelino had ever come up with a practicable or successful 'Hot Box Detector.'" (Master's Report, p. 24)

Further, the Master found:

"I find from the evidence before me that Servo made a true break through in the hot journal box detection field and that there is novelty, utility and unobviousness in the discovery. As to utility, there can be no question. The defendant acknowledges this and, more importantly, substantiates it by manufactoring and selling hot box detectors embodying all the essential features of Servo's detectors. In fact, the vertical and toe-in viewing angles are almost identical. At the time of the trial, both Servo and G. E. had somewhat refined and standardized their products. In August, 1960, Servo had sold or leased some 200 detectors and G. E. approximately 117." (Master's Report, p. 26, 27)

Continuing, the Master said:

"In standard practice Servo scans at a vertical angle of 25° and toed-in angle of 10°. G. E. scans at a vertical angle of 26° and an acute angle of 8°. Servo learned that in order to view all types of journal boxes and yet use the underside of the train as a reference background it was necessary to move its detector a little further from the rails and toe it in slightly—this, however, necessitated the lowering of the vertical angle. G. E. learned from Servo * * * and merely made a slight change in the two angles, producing however, the same result.

"G. E. insists that claim 5 of Servo's patent '309 is indefinite and cannot be construed to embrace specific claim 6, which is referred to as the 'toe-in claim;' that claim 6 must stand or fall without the support of claim 5, which is not a generic claim, and that Servo had discovered the 'toe-in method' and employed it in detectors leased and sold to railroads more than one year prior to June 30, 1958, the filing date of its continuation in part application, based on its original parent patent application filed November 6, 1956. Further, G. E. insists that claim 6 of the 'Orientation' '309 patent is barred by virtue of the fact that Servo Publication SB–23 (DX 69) read in conjunction with a letter from Servo to the Virginian Railway Company, dated June 30, 1957, which G. E. claims is typical of similar letters sent to other railroads, described the toed-in form of the invention; and, finally, G. E. relies on a publication in the Railway Age, dated July 1, 1957, but actually published—G. E. contends—before the date it bore." (Master's Report, p. 28)

The Master, upon examination of claim 5 of the 309 "Orientation" patent, held that it was a broad and generic claim,

and that it contained within it the embodiments of claim 6.

Essentially, the Special Master holds that the claims of the 309 "Orientation" patent covered the location of the detector along side a section of the track which would scan the journal box of the car at a proper vertical angle and a proper toed-in or acute angle which would successfully achieve the desired results of hot box detection; that this idea originated with Servo and that it was picked up and adopted by G. E., with modifications, but retaining the important principle of orientation or mounting.

The Court adopts the findings of fact of the Special Master to the effect that Servo was the first to successfully put the essential elements of a detector together in a working combination and to find the proper location and the proper vertical and toed-in angles for the hot box detector, although the Court has some misgivings as to whether the idea was originally conceived by Servo.

Fattor in 1949 and in 1951 was striking close to the problem, but for financial reasons his ideas were not patented, nor was there sufficient publication of Fattor's work to affect the granting of the '309 patent to Servo. In fact, there is absence of proof that Servo knew of Fattor's work.

■ Again, there is evidence of other investigation and experimental efforts (prior to Servo) directed toward solution of the problem, including the work of Warshaw (G. E.) in 1954, and various railway companies. But once the patent office, in face of all the prior art, granted the patent, the Court is met with the presumption that the patent is valid.

From the outset of the trial, it has been the Court's view that the controlling issue in this case is whether Servo, using the thermistor bolometer, magnetic wheel trips, shutters and other items necessary in combination to construct a hot box detector, was entitled to claim a valid patent by reason of it (Servo) being first to position the detector at a point where it would work successfully.

To the Court the preponderance of the evidence seems to support the conclusion of the Master that Servo was first in placing the detector alongside the track at a place where it would scan and record hot journal boxes, and where the detector would exclude undesirable signals and would view the journal box at the most desirable spot. As to this fundamental finding, the Court adopts the result of the report of the Special Master, notwithstanding the quaere which has perplexed the Court from the beginning of this trial, namely: Is the idea of location or positioning of the device a patentable one? In other words, is a position in space patentable? These misgivings on the part of the Court have been somewhat allayed by the admission of counsel for G. E. in the argument before the Court on exceptions to the Master's report—at which time counsel for G. E. (in answer to a question from the Court) expressed his view in the affirmative, with reservations as to circumstances.

■ The ingredients of the detector were obvious to one skilled in the art, but it is the Court's view, as it was the Special Master's, that Servo was the first to conceive and put into successful operation the detector located at a viewing point that would achieve the desired result. By reason of the fact that Servo was the first to discover and put into successful practice the proper viewing position, the Court confirms and approves the Special Master's findings on the 309 "Orientation" patent, and therefore holds the '309 patent valid, and further that it was infringed by General Electric.

In so holding, the Court has considered carefully G. E.'s defense to the '309 patent, which defense is fourfold and in substance contends:

(1) that the subject matter of the patent would have been obvious to a person having ordinary skill in the art;

(2) that it is invalid because of prior public use, sale and publication of its subject matter for more than one year prior to the disclosure of the subject matter to the patent office;

(3) that the patent does not disclose the best mode contemplated and known by the patentees for practicing the alleged invention; and

(4) that said patent was neither infringed nor copied.

### (1) *Obviousness*

In the argument of counsel for G. E., it was urged that obviousness was shown by the clearance requirements of the railways, and by the suggestions and work of McDonald, Pilcher (of the Norfolk and Western Railway), and Whitehead (of the Pennsylvania Railway).

One answer to the clearance argument is that there were places other than the Servo viewing point that would conform to clearance requirements and still fail to measure up as a successful hot box detector. Another thought is that one could have given up as hopeless the idea of making a workable detector in face of the rigid clearance requirements. A further observation is that although the railway clearance requirements were known to G. E. beforehand, G. E. did not adopt the Servo positioning until it knew from the Salisbury inspection the Servo "look".

As to Mr. Pilcher's contribution, the Court was impressed with his fairness as a witness, but at the same time, the Court must say that Mr. Pilcher was not positive and definite in his testimony as to where the idea of positioning came from. Mr. Pilcher's answer, "I think it came from me", is insufficient to prove, in face of all the other evidence, and reasonable inferences to be drawn therefrom, that it came from Mr. Pilcher.

■ Similarly, as to McDonald and Whitehead, the Court is unwilling to overturn the Master's findings by reason of the alleged suggestions of Mr. Whitehead of the Pennsylvania Railroad or Mr. McDonald of Servo—bearing in mind that the District Court is controlled by the provisions of Rule 53(e) (II) which provides that the Court shall accept the Master's findings of fact unless clearly erroneous, as it is stated in Lon-

don v. Troitino Bros. Inc., 4 Cir., 301 F.2d 116 (1963).

The best answer to G. E.'s defense of obviousness is the cold fact that notwithstanding the great need for a successful hot box detector by the railway industry and notwithstanding the constant quest for a solution to the problem, it was not until Servo located the proper viewing position that the device became a practical answer. The problem of locating the detector at a point which would view the most favorable spot of the journal box on a moving car under changing conditions, taking into consideration other factors of heat, light and atmosphere obtaining, was a difficult problem to solve, and as before stated, Servo was the first to come up with a working answer. The Court does not feel that finding this answer was as simple as defendant urges, or that it possessed the obviousness referred to and described in the Patent Act, which would defeat it. (35 U.S.C. § 103)

An excellent discussion on the test of obviousness applicable here comes from our own Fourth Circuit and is set forth in S. H. Kress & Co. v. Aghnides, 4 Cir., 246 F.2d 718, and Honolulu Oil Corp. v. Shelby Poultry Co., 4 Cir., 293 F.2d 127, and in Entron of Maryland, Inc. v. Jerrold Electronics Corp., 4 Cir., 295 F.2d 670.

### *Prior Art*

In this case there has been considerable evidence and discussion of prior art. The record embraces many pages of what was done by Canada, Warshaw, Orthuber, Johnson, Howell, Willey, The British Thompson-Houston Company, various railroads, and others in pursuit of the solution to the hot box detector problem. However, G. E. in its objections to the Master's Report states that no contention is made that the '309 patent was anticipated by the prior art.

The position of G. E. is that the prior art is to be considered on the test of obviousness—in other words, that the accomplishments of the various persons working with the hot box detector prob-

lem prove that the subject matter of the '309 invention was obvious to others having ordinary skill in the art. The faulty premise is that these various inventors did not succeed. The Court, confronted with the presumption of validity of the patent granted by the patent office, does not feel that the test of obviousness has been overcome by G. E. Quite true, in retrospect the assemblage of the detector ingredients and placing the same in the right location to do the job now appear relatively simple to one of ordinary skill in the art, but the test of the need and how long the need, the many efforts of trial and error, and the recognition of the invention as an answer, and the use by G. E. itself,[1] all add up to the fact that it was not an invention obvious to one of ordinary skill in the art.

(2) *Invalidity by Prior Public Use, Sale and Publication*

(a) *Prior Public Use and Sale*

■ Here G. E. contends that sales were made prior to June 30, 1957, to the (1) Reading Railway, (2) Boston and Maine Railway, (3) Norfolk and Western Railway, and (4) Chesapeake & Ohio Railway, and that such alleged sales were valid and would defeat the patent. Servo counters that these transactions were of an experimental nature, to which the Master agreed, and the Court upon a study of these transactions feels that these transactions were on more or less an experimental basis, and does not hold that the same voided the patent on the ground of prior public use or sale.

There is much evidence in the record relating to tests and experiments with various railway companies on the part of Servo in connection with the hot box detector, yet the Court adopts the views of the Master that the device was not in public use or on sale more than one year prior to the date of the continuation in part application, June 30, 1958. The experimental work with the railways in 1956 and 1957 was in an effort to perfect a satisfactory working device, and one observes from a reading of the record the many difficulties encountered, as well as the doubting attitude of the railways.

*Fattor*

Undoubtedly, A. P. Fattor (a former employee of the Denver, Rio Grande and Western Railroad) in 1945 conceived the idea and suggested a method of scanning journal boxes. In 1949 he filed a patent application but later abandoned it.

Fattor's proposals were by him sent to the A.A.R. Committee from whom he sought financial assistance, but such assistance was not forthcoming, and the Fattor work really died with the A.A.R. Committee and by abandonment in the patent office. The burden of proof being upon defendant to show that there was publication by reason of Fattor's disclosures, the evidence fails to show that Fattor's knowledge was available to the public. Moreover, there is no evidence that Servo or G. E. knew of Fattor's findings. The situation may be described as one wherein Fattor had excellent and original ideas on how to solve the problem, but, as is often true in life, he failed to carry through.

(b) *Prior Sale and Publication*

Defendant urges that there was publication prior to July 1, 1958 (the filing date of the continuation in part application), particularly stressing Servo Brochure SB–23 and 18 form letters mailed such as the letter to the Virginian Railway June 28, 1957. Following the reasoning of the Master, the Court feels that there was a continuing experiment to achieve a working result and that much more work was to be done before arriving at the required solution.

■ Similarly, G. E. contends that certain information appearing in "Railway Age" issue of July 1, 1957, run off the press June 28, 1957, constituted a prior publication. The evidence of the librarian and publisher of the "Railway Age" is not sufficient to prove that there

---

1. G. E. scans at an acute angle of 8°— Servo at an acute angle of 10°. G. E. scans at a vertical angle of 26°, whereas, Servo at 25°.

was publication of the article prior to July 1, 1957.

### (3) *That the Patent Does Not Disclose the Best Method of Practicing the Invention*

██ One of the requirements of the patent law (35 U.S.C. § 112) is that the patent must disclose the best mode known to the applicant for practicing the alleged invention. Although claims 5 and 6 may not be as clearly and precisely stated as each might have been described, yet we do not feel that the record justifies the conclusion that Servo withheld knowledge as to the best method of practicing the invention. The words of the statute, "particularly pointing out and distinctly claiming", is language susceptible of some latitude in interpretation. It would appear that in obtaining a basic patent, such as '309, that the inventor should be permitted a liberal construction of his claims. The doctrine of equivalents itself is based upon this principle; otherwise by varying deviations one's creative work would be nullified.

On the problem of indefiniteness of claims 5 and 6, the Master reported:

" * * * The test is whether the disclosures are sufficient to enable one skilled in the art to practice the invention. I am of the opinion, and so hold, that they are. The vertical angle is placed as between 20 and 50 degrees—preferably 35 degrees. G. E. maintains that when Servo learned that an angle of 25 degrees vertical produced the best results (when the toe-in angle however is 10 degrees) it should have specified this angle in its continuation in part application. To have thus narrowed its claim in this respect would have, to all intents and purposes, destroyed the effective coverage of the patent, and would have permitted others to practice the teachings of the patent, and reap its benefits by merely making a slight change in the upward or vertical angle.

"As to the toed-in angle, G. E. states this could be any angle between 0° and 90°, as claim 6 of the patent described the angle as 'an acute angle relative to the longitudinal direction of the track.' Claim 6, however, includes all the features of Claim 5. Given its broadest interpretation it could not exceed 0° to 45° otherwise, regardless of the teaching in the patent that the orientation must be such as to be focused on the underbody of passing cars which constitute an ambient background, the dector would miss scanning the journal * * * "

* * * * * *

"Section 112, 35 U.S.C. was never intended to so limit and circumscribe the claims of an invention as to nullify their protective coverage, especially is this true when due to the character of the invention it is difficult to define their exact implications: Eibel Process Co. v. Minnesota & Ontario Paper Company, 261 U.S. 45 [43 S.Ct. 322, 67 L.Ed. 523] (1923); Cold Metal Process Co. v. Republic Steel Corp. [D.C.], 123 F.Supp. 525, affirmed 233 F.2d 828 (C.A.6, 1956)."

During the trial, the Court was puzzled by the degrees and angles of the claims and questioned counsel as to what point there would be no infringement of claims 5 and 6. To this the Court cannot say that it obtained a satisfactory answer. But, after all, claim 5 is a broad and generic claim, embracing the more narrow and specific claim 6, and with the Special Master, the Court holds that the '309 patent does not fail because of indefiniteness or because Servo failed to set forth the best mode known to Servo or contemplated by Servo for practicing the invention.

### (4) *Infringement and Copying of '309 and Wilful Infringement*

██ Plaintiff, in argument, insisted upon seven reasons why G. E. should be

found guilty of wilful infringement, namely:

(1) the Cockrell incident at Salisbury and Cockrell's demeanor on the witness stand;

(2) the failure of G. E.'s patent attorney, Mr. Goldenberg, to properly advise G. E. in light of (a) Baldwin's advice to Southern Railway; (b) carelessness in Goldenberg's opinion, and (c) failure to act in good faith in looking at and appraising the force of the '309 patent;

(3) letter of Parkinson to Koerneke, dated October 15, 1958;

(4) Menaker's testimony;

(5) Sinclair's testimony;

(6) Koerneke's testimony;

(7) the filing of the motion on April 1, 1963, seeking leave to file a supplemental counterclaim.

Analyzing these reasons, either separately or together, there is nothing to indicate bad faith on G. E.'s part. The only item that comes close is the Cockrell incident at Salisbury, and even this obtaining of data came about through an invitation of Southern Railway to the G. E. people to inspect the Salisbury installation, and to report what G. E. could do toward producing and marketing a hot box detector that would respond to the needs of the railways and at a reasonable cost.

It occurs to the Court that if G. E.'s conduct has been so clearly bad as to warrant the tag of wilful and deliberate infringement, then an immense amount of time (approximately four years) and an enormous sum of money has been expended in research and litigation in seeking to have determined in a court of law the close question of the validity of patent '309.

■ The Court does not agree with the Master that there exists wilful and deliberate infringement in this case. The Court contest has been "mightily" fought over what the Court conceives to be the basic issue—*whether a position in space in relation to the object to be viewed and so as to achieve the desired result may be the subject of a valid patent.* The Court says yes on this point and yes on infringement, but does not find sufficient reasons for attributing *mala fides* on the part of G. E. as to warrant punitive or increased damages.

To the Court, there is difficulty in distinguishing between infringement and copying, when the words are viewed in connection with this case. Obviously, there is overlapping in the use of the terms. The Master has held that G. E. *wilfully* infringed and copied the '309 invention. The Court adopts the view of the Master to the extent that G. E. infringed the '309 patent, but the Court would not want to say that G. E.'s efforts were in defiance of a patent (to be later issued) which G. E. believed to be valid. The Court adopts a more generous view as to G. E.'s activities in the manufacture and sale of hot box detectors, in that the Court is of the opinion that G. E. was working in good faith with the railroads to arrive at a solution of the problem, and the Court would not use the word "wilful" in its usual connotation.

The visit of G. E.'s Cockrell, above referred to, to inspect Servo's installation on the Southern Railway at Salisbury (initiated by the Railway Company) undoubtedly provided G. E. with valuable leads for its development work. With its great resources and skill, G. E. busied itself to come up with the right answer to the railways dream of a satisfactory hot box detector. The end result required much effort, and in reaching it not only did G. E. make use of its highly trained personnel and equipment, but it had the advantage of the creative ideas of Servo which are covered by Servo's '309 patent.

Having held that Servo's '309 patent is a valid one, then it follows that if G. E. manufactured and sold detectors using substantially the Servo point of viewing, taking into consideration the other factors and conditions, then G. E. is guilty of infringement. The undisputed evi-

dence is that many such hot box detectors have thus been sold by G. E., therefore, the Court holds that G. E. has infringed the '309 patent of Servo. But in so doing, the Court does not hold that G. E.'s acts were such as to warrant finding punitive damages against the defendant.

Similarly, on the question of copying, the Court is of the opinion that from Cockrell's visit to Salisbury and from the work and information flowing from Servo, G. E. gleaned or copied ideas that belonged to Servo under the '309 patent which we hold valid, and insofar as Servo has been actually damaged thereby, it is entitled to recover. But again, to the Court there is not sufficient basis on which to award punitive damages.

■ The fact that G. E. questioned the validity of the '309 patent "does not [of itself] constitute wilful infringement." (General Motors Corporation v. Dailey, 6 Cir., 93 F.2d 938)

Here G. E. was working on the hot box detector problem before the '309 patent was issued to Servo, and from the outset G. E. has steadfastly contended that the Servo idea was not a subject for a valid patent. In declining to grant a preliminary injunction sought by Servo early in this suit, United States District Judge Roby C. Thompson (now deceased) in effect recognized that there was doubt as to the validity of the patent. While it may be customary to defer the question of damages until after the questions of validity and infringement have been finally determined by the Court of last resort, we see no reason to delay this facet of the District Court decision. It is this Court's view that only compensatory damages are justified in this case. This Court finds no basis for awarding damages for unjust enrichment and no basis for "smart" money. Notwithstanding the District Court's holding that the '309 patent is valid and has been infringed, we plainly see that the question of validity is reasonably debatable, and will in good faith and by proper motives continue to be debated until settled by the Court of last resort.

## Damages

■ The Court, being of the opinion that G. E. acted in good faith, does not find that plaintiff is entitled to punitive damages or increased damages (under 35 U.S.C. § 284), and therefore will not be awarded. The plaintiff shall have and recover of defendant actual damages upon a proper accounting to be hereinafter made and determined.

## Injunction

■ The Court having held that the '309 patent is good and valid in law and that defendant has infringed upon the claims of said patent, the defendant, G. E., will be enjoined from further infringements upon said patent.

## Counsel Fees and Court Costs

Chief Judge Soboloff has recently spoken on this subject in the case of Berry Brothers Corp. v. Sigmon, etc., 4 Cir., 317 F.2d 700, in which he said:

"It is only in an exceptional case that counsel fees are awarded to the successful litigants. 35 U.S.C.A. §§ 284, 285. The Court committed no error in declining to award counsel fees to either party and in dividing court costs equally."

To the Court, this is not an exceptional case, and while we will not at this stage of the proceedings finally foreclose the question of the allowance of attorneys' fees to plaintiff, yet it is doubtful if this is a proper case for such allowance. A final determination will be made on this question if and after an accounting is had.

■ As to costs, the plaintiff having prevailed on the basic '309 patent, the Court will order that plaintiff have and recover of the defendant its taxable costs herein—jurisdiction to determine the amount thereof, and to re-examine the question of attorneys' fees, being expressly retained.

## Supplemental Counterclaim

A motion, with supporting affidavit of Ross, was filed by G. E. on April 1, 1963, alleging that G. E. has developed a modi-

fication of the hot box detector since the trial of this action, which modification was developed in the late fall of 1962 and has been installed on the N & W and Southern railways and that this improved device has been put to successful tests. The affidavit of Ross recites:

"2. Since the trial of this action defendant has developed a modification of the hot-box detector which it was manufacturing and selling at the time of the trial, the significant point of difference between the new device and the device being manufactured at the time of the trial is that in the new device a movable shutter blade is included in the device between the external lens and the bolometer. This shutter is opened and closed in such a way that, in the case of standard freight cars, infrared radiation from outside sources is prevented from impinging on the bolometer except when a journal box of the passing train is in the line of view of the detector, so that the bolometer of the new shutter-type device receives external radiation only from the journal boxes, is not directed at the underside of the body of the car, and does not utilize any part of the car to establish a 'reference background' for the bolometer."

And in the petition the prayer of G. E. is:

"WHEREFORE, defendant prays, in addition to the relief sought in the counterclaim included in defendant's answer and counterclaim served and filed herein September 9, 1959 (all allegations of which are included herein by reference), for a judgment by this Court that the manufacture, sale and use by General Electric or the use by its vendees of such a shutter-type device does not constitute infringement, direct or contributory, of any valid claim of said patent 2,880,309, or any other rights of plaintiff, and for such other relief as may be just and proper."

Servo objects to the timeliness of the filing of the supplemental counterclaim and further avers that there is no justiciable controversy as to this new device so as to confer jurisdiction, and has filed an affidavit, with exhibits, in opposition to G. E.'s motion for leave to file said supplemental pleading.

Having reached the conclusion that the '309 patent is valid by reason of the positioning of the hot box detector and has been infringed, the Court does not, at this stage of the proceedings, deem it necessary to rule on the question of justiciable controversy and jurisdiction to entertain G. E.'s application for declaratory judgment relief raised by Servo in opposition to the filing of said supplemental counterclaim. The petition of G. E. with the supporting affidavit of Ross, above referred to, and the affidavit of Menaker, filed at the time of hearing arguments, together with the affidavit and exhibits of Servo filed in opposition, are in the record for the inspection and consideration and for such purposes and value as the Circuit Court of Appeals may later deem appropriate, and the District Court will await further proceedings and developments to determine what further consideration should be had by the District Court thereon.

For the District Court to now rule that the supplemental counterclaim is timely and properly filed would be at this late date to reopen the case for a lengthy controversy, possibly involving the taking of voluminous testimony, over the new and modified G. E. device, and the District Court does not feel that this action, begun August 26, 1959, should be further delayed.

Even if the District Court treated the supplemental counterclaim as properly and timely filed, this new device on the N & W Railway (it was not clearly stated as to the Southern) has the upward and toed-in viewing look of Servo, and under this Court's theory of holding the '309 patent valid by reason of its viewing position, the present view of the Court is that the new device would not affect the basic decision herein.

## Alarm Patent

The Special Master upheld the validity of the Alarm '575 patent which he describes as:

"The '575, or 'Alarm' patent being detectors mounted alongside opposite rails of a length of railroad track, including gating means determining a time interval within which both ends of a given axle will pass the respective images of the heat responsive means, the outputs of both said heat responsive means being fed to the gating means only during the gating interval, with storage channels, and read out means, so that the temperature of each journal box can be compared with the other and with a predetermined threshold in such a manner as to sound an alarm, or indicate by some other method (the lighting of a signal button) the presence of an overheated journal box. Whereupon, a counter means is set in motion to count the wheels (and, therefore, axles) of the passing train (from the overheated journal box to the end of the train when the detector is mounted so as to view journal boxes of a receding train), thus enabling one, through the use of a counter panel, to accurately locate the offending journal box. The reception, storage and read out of the electrical signal being almost instantaneous so that the process may be repeated for each passing journal box." (Master's Report, p. 8)

In support of holding the alarm patent valid, the Master found that Claims 3, 4 and 5 (designated by G. E. as the "Apparatus Claims") were valid, as well as Claim 20 (described by G. E. as the "Method Claim"), and that these four claims had been infringed.

Under Claims 3, 4 and 5, Servo assembled or combined certain parts of the alarm and detector—the items already existed singly or in combination, which when coupled with Claim 20 accomplished the alarm system result of Servo.

After all, an alarm is only a device for making a noise or giving a warning. The alarm principle is as old—perhaps older—than the familiar alarm clock. It is a principle which was practiced in principle before Servo or G. E. came into existence. By mechanical means of springs, whistles, noises, devices of varying types, alarms have been given. In this modern age electronics have taken the place of the old methods of mechanical activation. In fact, the alarm principle is so common place that it has now permeated almost the entire field of mechanical know-how and mass production for which the United States is famous. One driving an automobile or firing a boiler or operating any electrical machine has the advantage of indicators and alarms, and every launching pad and space capsule, are literally filled with alarm indicators.

Admittedly to the Court, a layman in the scientific field, the circuitry is complicated, but the test of obviousness is to one of ordinary skill in the art. In this case, the Court is convinced by hearing and considering the evidence that G. E. not only possessed ordinary skill but had *extraordinary* skill in the field and that the manufacture of an alarm system to the hot box detector was elementary to this defendant.

Defendant, G. E., states that it has sold only six differential alarms—three before the '575 patent and three after—out of over a hundred detectors marketed by G. E. Thus, the controversy as to the '575 alarm patent is of little commercial importance. Regardless of the amount involved, it is the principle that is important. The situation, to the Court, is one in which the defendant, G. E., had unusual talent and skill in electronics; G. E. not only had the advantage of all prior art in the alarm field, but was itself, at the time of the '575 alarm patent of Servo (December 6, 1960, on an application filed May 26, 1959, as a continuation in-part of an application filed November 8, 1957), before and after equipped with personnel and materials second to none to manufacture and mar-

ket alarm systems of every kind and description to fit any need in this mechanical electronic modern age.

Recorders, using technique similar to that used in making an electrocardiograph tracing, may or may not be used with an alarm system. The advantage of its use is to indicate on a tape what was detected on the journal boxes in the passage of the train. The alarm system, such as is described in the record as used by the Southern Railway, lights up a button at a central point and eliminates operators examining recorder tapes as each train moves by a detector. The hot box detector reads the temperature of a journal box on each end of the axle, either friction or roller type hearings, and differentially compares the heat signals, and an alarm is actuated if a heat signal is recorded, which is greater than the proper threshold. The alarm system of Servo involves such technical knowledge as the storing, the reading out and in, integrating, erasure and subtraction of heat signals.

Further, it involves the gating of signals, magnetic transducers, or wheel trips, which actuate the gating, and the peak heat signal is read in during the gating interval. It involves capacitors or condensers used for storage purposes and, in general, involves circuitry which is well understood by an electrical engineer.

But these electrical engineering features, to people such as Cooper, Cockrell, Korneke, Menaker, Sinclair and others of G. E., are common place and pose no real problem for them to understand or to make use of in developments. The circuitry used by G. E. was designed by Sinclair, but the Court was convinced during the trial (and remains so convinced) that G. E.'s Cockrell or G. E.'s Cooper, and numerous other experts of G. E. in the electronics field, were fully capable to design a workable alarm system, and that the entire work of Servo in connection with the alarm patent was quite obvious to the many G. E. experts skilled in this art.

Too, the prior art or the state of the art is revealed to some extent by:

(1) Berti's letter dated November 23, 1953 (Px–246);
(2) Servo's proposal (Px–385–1);
(3) Servo's proposal (Px–385–5);
(4) Chubb Patent, (1926) (Dx–139);
(5) British Patent No. 613,116, (1946) (Dx–140);
(6) German Patent No. 1,031,338, (1957) (Px–562);
(7) Newell Patent;
(8) Baughman Patent;
(9) the work of Cockrell and his application for a patent;
(10) the work of railways—N&W and others;
(11) the general knowledge of the underlying principles of alarms —including circuitry, differential evaluation of separate radiation observations, et cetera.

It may be that no precise work of the prior art contained a complete anticipation of the '575 alarm patent, but it does not follow that the alarm patent was unobvious to one with familiarity in the art.

To the Court, the prior art or the state of the art, pointed the way for the '575 alarm patent; for the defendant, G. E., the prior art and the state of the art, coupled with its own research and extraordinary technical engineering knowledge, the alarm system was no problem, and on the basis of obviousness the Court holds the '575 alarm patent invalid.

Further, even if valid, the Court fails to find infringement, because the circuitry used by G. E. in its alarm system was designed by one of its own engineers, Mr. Sinclair, and, according to Cooper and Menaker, are substantially different.

The alarm patent does electronically a comparison of temperatures and gives a warning, which was previously accomplished by persons handling the operation. Apparently, the elements used by Servo were available to anyone in the commercial market, and once a satisfac-

tory hot box detector was in existence, this called for an accessory alarm system to give warning and to designate the car and axle where the trouble existed. Quite true, the detectors may be sold without an alarm system and the desirability is argued, pro and con, yet it would seem to the Court that an automatic alarm feature will in due time be commercially favored by the railways.

Mention has been made of the Cockrell (G. E.) application, but this would not estop G. E. to deny the invention; in fact, this independent work of Cockrell, however similar, points to the obviousness of the development to the one skilled in the art.

Too, the German provisional patent ('338), seven and one-half months before the Servo application, caused rejection of Servo's patent at first by the Patent Office, indicates that others skilled in the art, working independently, arrived at substantially the same concept, and thus this tends to show the subject matter was obvious.

Again, the Chubb patent and the British patent, both using well known elements of the alarm system, were not before the Patent Office when the Servo patent was granted—from which the Court infers that a different conclusion may have resulted in awarding the patent.

However, the Court does not rest its decision solely on what happened in the Patent Office. We begin with the presumption of validity of the alarm patent, but when the whole picture is now fully considered, the Court is of the opinion that 1) the patent is invalid by reason of obviousness, and 2) even if valid, the evidence fails to convince the Court that G. E. has infringed it; and in these respects the Court rejects the report of the Special Master.

Numerous citations of the law applicable to the case have been cited by counsel for plaintiff and counsel for defendant, which citations adequately and fully cover every legal problem involved. Really, to the Court, the difficulty in this case is not so much in determining the legal principles relating 1) to the presumption of validity of patents, 2) the applicable judicial test of invention, 3) the conditions for obtaining a valid patent, such as prior knowledge, prior art and prior public use or sale, and the effect of oral evidence of prior invention or use, 4) or the test of infringement, 5) or wilful infringement, 6) or the interpretation of scope of the patent, 7) or the question of compensatory damages, 8) or whether punitive damages are warranted, 9) or whether counsel fees and court costs should be awarded to the party substantially prevailing, and, in fact, as to any legal question that has arisen, but the difficulty in this case is in applying the law to the facts of this specific case.

Counsel for the plaintiff has made citations of over one hundred decided cases and text references, and defendant has likewise made reference to many authorities on the legal problems presented. The Court has not undertaken in this opinion to discuss the various citations of counsel, but will say that out of the host of authorities cited no case is found which holds precisely that a position in space is patentable. The two cases which appear to strike closest to the point on the basic '309 patent are: Eibel Process Co. v. Minn. & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Loew's Drive-In Theatres v. Park-In Theatres, 1 Cir., 174 F.2d 547.

In the Eibel case, the Court observed that the change of position was in the machine *itself* and was not a *position* in space. On this Mr. Walker, chief counsel for defendant, responded, "I honestly don't think it is a distinguishing characteristic; in other words, in theory, I would say there is nothing which inherently disqualifies from patenting the selection of a position." (Tr. Argument p. 203–4). Confronted thus by this admission of counsel, coupled with the presumption of validity, and finding no authority to the contrary, the Court, for reasons stated herein, is upholding the '309 patent.

The Theatre case, although possessing similarities, is not sufficient to overthrow the Court's holding of validity for the '309 patent.

An order will be entered in accordance with this opinion.